UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

**CIVIL ACTION (MASTER FILE) NO. 5:06-CV-316 - KSF**

**IN RE: AIR CRASH AT LEXINGTON, KENTUCKY, AUGUST 27, 2006**

**RELATING TO: ALL CASES**

# OPINION AND ORDER

This matter is before the Court on the motion of the United States of America to dismiss certain claims of Comair, Inc. ("Comair") for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) [DE 2137]. Having been fully briefed, this matter is ripe for consideration.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The United States, on behalf of the Federal Aviation Administration ("FAA"), argues that many of the facts alleged by Comair in its complaint reflect matters that were the responsibility of the Blue Grass Airport and for which there was no waiver of sovereign immunity under the Federal Tort Claims Act ("FTCA"). It also argues that Comair's allegations seek to hold the United States liable for actions taken in its role as a regulator and for decisions of federal officials made in the exercise of their discretionary function. Finally, the United States argues these claims must be dismissed because they fail to state a cause of action under Kentucky law. [DE 2137].

It is important to note that the motion to dismiss does *not* address the claims of "negligence on the part of the federal air traffic controller who provided services to Flight 5191 on August 27, 2006." *Id.* at 2. Instead, the motion is addressed to allegations regarding the runway and taxiway construction, charting, NOTAMs, allegations the FAA and the airport were agents of one another, and allegations regarding the schedule of the air traffic controller. *Id.* at 2-3.[1]

---

[1] The United States references specific paragraphs containing these allegations in the First Amended Third-Party Complaint in Case No. 07-CV-15-KSF (*Cone*), but seeks application to all of Comair's complaints that are identical in substance.

Comair responded that (1) pursuant to the "undertaker's" or "Good Samaritan" doctrine, the United States voluntarily assumed a duty to use due care in inspecting Blue Grass Airport; (2) the discretionary function exception does not apply to negligent certification and inspection of the Airport; (3) the United States had a duty to communicate accurate information to Comair regarding the condition of the airport; (4) the duty to communicate accurate information in aeronautical charts does not fall under the discretionary function exception; and (5) the Blue Grass Tower Manager had no discretion to ignore an FAA directive concerning staffing of the mid-shift so as to fall under the discretionary function exception. [DE 2345].

The United States replied that Comair conceded that the United States has no liability for the alleged negligence of the airport or its employees. [DE 2424, p. 3]. It argued that the FAA did not owe Comair any duty under the undertaker's doctrine and that the discretionary function exception applies to the allegations regarding inspection and oversight, the FAA's involvement in the airport's decision regarding an interim chart, and the 2-2-1 watch schedule. *Id.* at 7. Regarding Comair's arguments that the controller should have recorded a Notice to Airmen on the day of the accident and that the tower should have been staffed with two controllers, the United States noted these matters were not included in its motion for summary judgment. *Id.* In reply to arguments regarding the Runway Safety Program, the United States noted that Comair's Complaint did not contain any allegations regarding this program, and it was not discussed in the motion to dismiss. The United States argued that Comair's raising this issue for the first time in its response should not be construed as a motion to amend and, even if it were, it would be futile because the allegations fall under the discretionary function exception. *Id.* at 11.

## II. ANALYSIS

### A. Standard

"A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for

jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *Abbott v. Michigan*, 474 F.3d 324, 328 (6th Cir. 2007) *quoting DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

**B. Jurisdiction Under the Federal Tort Claims Act**

"The FTCA does not create a cause of action against the United States. Nor does the FTCA provide a means of enforcing federal statutory duties. Rather, it constitutes consent to suit and is fundamentally limited to cases in which 'a private individual [would be liable] under the circumstances.' 28 U.S.C. § 2674." *Myers v. United States*, 17 F.3d 890, 894 (6th Cir. 1994). "[T]he existence of some relationship between the governmental employee and the plaintiff to which state law would attach a duty of care in purely private circumstances is required" *Id.* at 899. Where a government employee, acting in the scope of his employment, fails to exercise due care in circumstances where a private individual would be liable under state law, Congress still retains sovereign immunity under the discretionary function exception pursuant to 28 U.S.C. § 2680(a). *Id.* at 894.

In *Myers*, the court noted that consideration of the discretionary function exception before determining whether a private individual would be liable under the circumstances was placing "the proverbial cart before the horse." *Id.* Accordingly, this Court will consider first whether Comair has shown a relationship between the FAA and Comair such that state law would attach a duty of care in purely private circumstances and, thereby, overcome the first hurdle to establishing jurisdiction under the FTCA.[2]

[2] Comair argues that the FAA's motion should be converted to a motion for summary judgment such that the only burden on Comair is to show a genuine issue of material fact. [DE 2345, p. 4]. Unlike *Stables v. United States*, 366 F. Supp.2d 559, 562 (S.D. Ohio 2004), on which Comair relies, this Court does not need to decide the merits of the case and determine a factually complex question of whether the discretionary function exception is applicable.

1. Negligence of Blue Grass Airport Employees

Comair did not respond to the arguments of the United States that it cannot be held liable for the alleged negligence of the Blue Grass Airport or its employees. The FTCA grants jurisdiction over claims caused "by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). An "employee of the government" includes military personnel and "employees of any federal agency." 28 U.S.C. § 2671. Accordingly, the United States cannot be held liable for the acts of persons who are not federal agency employees. *Logue v. United States*, 412 U.S. 521, 532 (1973); *United States v. Orleans*, 425 U.S. 807, 813-14 (1976). Comair's claims alleged in Paragraphs 23-24, 39, 56-61 of its Complaint will be dismissed on that ground.

2. Comair's Claims Regarding Inspections, Charts, NOTAMS, and Schedule

The remaining allegations against the United States fall into the following categories: (1) runway/taxiway and construction allegations, such as a breach of duty to correct, repair, replace, inspect and/or approve the configuration, design, lighting, marking and signage at the airport and a breach of duty to oversee the construction and inspect for conformance with federal rules; (2) charting allegations, such as a breach of duty to provide accurate information regarding configuration, signage, marking and lighting of the Airport and to provide instructions or warnings to the crew if these items were not accurately reflected on the Jeppesen chart; (3) NOTAM allegations, such as a breach of duty to inform crew regarding construction activities at the Airport; and (4) scheduling allegations that the FAA required a demanding and oppressive schedule for the air traffic controller such that he was unable to perform his duties. [DE 2137, pp. 2-3].

3. General Responsibility for Inspections, Charts, and NOTAMs

The United States has discretionary regulatory power to prescribe minimum safety standards for airports serving "any passenger operation or air carrier aircraft designed for at least 31 passenger seats. " 49 U.S.C. § 44701(b)(2). It also has discretionary authority to issue

operating certificates to airports. 49 U.S.C. § 44706. The responsibility for compliance with the FAA regulations governing airports rests with the *airport.* Certificate applicants must submit an Airport Certification Manual, which must detail the manner of compliance with the regulations. For example, the Blue Grass Airport must conduct a daily self-inspection of its property, including inspection of markings, lighting, and signage and must maintain records of its daily inspections for twelve months. 14 C.F.R. §§ 139.327, 139.339; [DE 2137, Ex. C, Airport Manual, pp. 18-19]. The FAA conducts an annual inspection with limited spot-checking, including a determination of whether the airport is conducting its self-inspections. [DE 2137, Ex. A, Price Dep., pp. 46-47]. The FAA conducted an annual inspection of the Blue Grass Airport on December 5-6, 2005, and found no violations of Part 139. [*Id.*, pp. 100, 246, 248]. This was the last FAA annual inspection prior to the crash of Flight 5191. FAA Order 5280.5B, ¶ 501.a. states in part:

> Airport safety depends primarily on voluntary adherence to regulatory requirements. Therefore, compliance is promoted primarily through education, training, and counseling, and only where these efforts have failed by formal enforcement action.

The FAA makes monetary grants for improvement to airports pursuant to 49 U.S.C. § 47104. Recipients of the grants agree to certain obligations or assurances that require the airport to maintain and operate its facilities safely and efficiently and in accordance with specified conditions. FAA Order 5190.6A, ¶ 1-3; DE 2137, Ex. F. The FAA offers advisory services as part of its educational effort to promote voluntary compliance with federal regulations.

> While the FAA will not substitute its judgment for that of the airport owner in matters of administration and management of airport facilities, it is in a unique position to assist airport owners in achieving voluntary compliance through prudent advice and counsel. This will be primarily directed in assisting airports to understand the nature and applicability of compliance obligations affecting their airport.

*Id.* at ¶ 5-1(b)(2). "The sponsor is responsible for providing all project engineering including the preparation of plans and specifications, construction supervision, and the conducting of inspections and testing needed for project control." FAA Order 5100.38, ¶ 1002; DE 2137, Ex. G. The FAA may conduct periodic inspections to evaluate the adequacy of sponsor's inspection activities. "In

no case shall FAA personnel place themselves in the role of providing resident inspection services or issuing construction directions to the sponsor's contractors." *Id.* at ¶ 1220(a). "The sponsor is required to provide adequate, competent, and qualified engineering supervision and construction inspection during all stages of the work." *Id.* at ¶ 1221.a. Blue Grass Airport submitted a safety plan to the FAA to explain how it would comply with the safety assurances required under the grant, including compliance with such Advisory Circulars as 150/5370-2E, "Operational Safety on Airports During Construction." [DE 2137, Ex. I, Bowers Dep. at 117; Ex. J., BGA Safety Plan Documents; Ex. K, BGA Safety Plan Documents; Ex. L., BGA Construction Safety/Security Program Brochure Phase III; Ex. M, A/C 150/5370-2E].

Regarding reporting of airport conditions through the NOTAM system, federal regulations place responsibility on the airport for reporting the condition of the airport to airlines. Specifically:

> In a manner authorized by the Administrator, each certificate holder must –
> (a) Provide for the collection and dissemination of airport condition information to air carriers.
> (b) In Complying with paragraph (q) of this section, use the NOTAM system, as appropriate, and other systems and procedures authorized by the Administrator.
> (c) In complying with paragraph (a) of this section, provide information on the following airport conditions that may affect the safe operations of air carriers:
>
> > (1) Construction or maintenance activity on movement areas, safety areas, or loading ramps and parking areas.
> > * * *
> > (6) Malfunction of any lighting system, holding position signs, or ILS critical area signs required by § 139.311.
> > * * *
> > (9) Any other condition as specified in the Airport Certification Manual or that may otherwise adversely affect the safe operations of air carriers.

14 C.F.R. § 139.339. Additionally, part of the airport's responsibility as a grant recipient was the following: "If any part of the airport is closed or hazardous to use, the owner is responsible for providing warning to users, such as adequate marking and issuing a Notice to Airmen (NOTAM) to advise pilots of the condition." FAA Order 5190.6A, ¶ 4-7.a.(2). The Airport Manual states: "The following personnel or their appointed representative are authorized to issue NOTAMs: Executive Director; Director of Operations; Chief of Public Safety." [DE2137, Ex. C, p. 27]. Finally, several

witnesses testified that the FAA may be aware of a NOTAM and may even recommend that one be used, but the responsibility always remains with the airport. [DE 2137, Ex. B, Berkovitz Dep. at 127; Ex. A, Price Dep. at 191, 194, 196, 204-05, 229; Ex. I, Bowers Dep. at 65-66, 78, 85-86, 94-95; Ex. H, Dupree Dep. at 207-209, 276-278].

Comair alleged that the United States had a duty to ensure that accurate information "corresponded with the Jeppesen chart utilized by the Comair Flight 5191 crew." [Complaint ¶ 59]. The United States notes that Jeppesen is a private company whose employees are not employees of the United States. [DE 2137, p. 15]. Several witnesses testified that it is the responsibility of the airport to make sure current and accurate information is used to create the charts. [DE 2137, Ex. H, Dupree Dep. at 17-18; Ex. B, Berkovitz Dep. at 138; Ex. A, Price Dep. at 71, 162]. The FAA acknowledges that Blue Grass Airport officials verbally discussed with FAA Airport Program Manager Tommy Dupree whether the airport would issue an interim chart showing the construction activities. [DE 2137, Ex. H, Dupree Dep. at 131-33]. Because such a chart would not have met the publication schedule for Government charts, Mr. Dupree recommended that only a final, post-construction chart be issued. [Ex. H, Dupree Dep. at 140-143, 186-88, 267. While the airport could have published the interim chart anyway, it decided to publish only a diagram of the concluded project and issued a NOTAM explaining taxiway changes during the remaining construction period. [Ex. H, Dupree Dep. at 226-27, 267-74].

4. <u>Good Samaritan doctrine</u>

When considering whether local law would make a private person liable in tort, the court has said that "like circumstances" do not restrict the inquiry to the same circumstances and that a broader view is required. *United States v. Olson*, 546 U.S. 43, 46 (2005).

Comair's only legal argument in an effort to establish a duty to Comair under Kentucky law is the "Good Samaritan" or "undertaker's" doctrine from the Restatement (Second) of Torts, § 324A. That doctrine provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect [or perform] his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaking to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A; *Myers v. United States*, 17 F.3d 890, 901-02 (6th Cir. 1994); *Ostendorf v. Clark Equipment Co*., 122 S.W. 3d 530, 538 (Ky. 2003).

In support of its Good Samaritan duty argument, Comair first claimed that the FAA did not use due care in certifying the Airport Certification Manual ("ACM") for Blue Grass Airport in May 2005. It based this claim on references in the Manual to allegedly outdated and cancelled Advisory Circulars and an alleged failure to exclude Runway 26. [DE 2345, pp. 10-12]. It argued that the Airport relied on the approval of its ACM and did not ensure that its facilities met current standards.[3] Comair contended that the result of the erroneous approval of the ACM was that any inspections of the Airport did not reflect current standards. It extended this argument to a claim that the Airport Operating Certificate should not have been approved, and that air carriers are prohibited from operating at airports without a proper certificate. The United States replied that Comair's Complaint does not mention the ACM and there is no allegation that deficiencies in the manual reflected a breach of duty to Comair or that they were the proximate cause of the accident.

Comair next claimed that the FAA had a duty to accurately communicate information to Comair regarding airport conditions by NOTAM or other appropriate means. [DE 2345, pp. 15-18]. The United States replied that whether the controller should have issued a NOTAM was *not* raised

---

[3] Comair made these arguments in a conclusory fashion without factual support. The United States points out factually that the ACM *does* exclude Runway 8/26. "Runway 8/26 and taxiways D, E, F. and G are general aviation paved areas and not subject to FAR Part 139." [DE 2137, Ex. C at US004059].

in the motion to dismiss and is not subject to review at this time. [DE 2424, p. 7]. Comair further claimed that the FAA assumed a duty of the Blue Grass Airport relating to a Runway Safety Program and that the Air Traffic Control Manager did not attend meetings. [DE 23456, pp. 21-23]. The United States replied that Comair made no allegations regarding the Runway Safety Program in its Complaint and this subject was not raised in the motion to dismiss. Moreover, the evidence is that no one was required to attend any meetings. [DE 2424, pp. 11-14].

In *Florida Auto Auction of Orlando, Inc.*, 74 F.3d 498 (4th Cir. 1996), a car auction company brought a claim against the United States under South Carolina's Good Samaritan law because a Customs official permitted certain vehicles to be exported without requiring originals or certified copies of the certificates of title, despite a regulation requiring them. The Customs official was provided only a copy of the bill of sale. *Id*. at 501. The court reversed a bench trial verdict in favor of the plaintiff, saying: "the Customs regulations do not represent an effort specifically to 'render services' to Appellees; instead the regulations and authorizing legislation were intended to deter the removal of stolen autos from the United States." *Id.* at 504-05. The court also found no evidence of genuine reliance on the Customs officials to enforce the regulation.

Similarly, in *Roberson v. United States*, 382 F.2d 714 (9th Cir. 1962), the United States retained the right of inspection of a dam construction project to determine the contractor's compliance with the project contract. Two of the contractor's employees fell and were injured while completing cementing and grouting of the dam spillways. They brought an action against the United States under Arizona's Good Samaritan doctrine. The court held that, for the Good Samaritan doctrine to be applicable, "it must be shown that the purpose of the actor was to render a direct service to the person who was harmed, or to persons of that class." *Id.* at 720. "No such direct relationship existed between the Government and the workmen at Glen Canyon Dam, at least with respect to the Government's safety activity." *Id.* at 721. With respect to liability to third persons, the court further concluded, "[i]n conducting its safety inspection program, the

Government was not undertaking to render services to the contractor. It sought only to protect its own interest, namely to assure itself that the contractor was performing in the manner required of it under the contract." *Id.* Moreover, the Government's safety inspection activities "did not relieve the contractor of any of its contractual duties; quite to the contrary, it was designed only to make sure that the contractor performed those duties." *Id.*

Litigants have tried with little success to impose a duty on the FAA under the Good Samaritan doctrine. In *Clemente v. United States*, 567 F.2d 1140, 1144 (1st Cir. 1977), a member of the FAA staff ordered a District Office to take steps regarding the surveillance of large turbine-powered aircraft. Following a plane crash and the death of passengers and crew, the passenger relatives and representatives claimed that the FAA was negligent in failing to warn the passengers that the aircraft on which they were about to embark was overweight and lacked a proper flight crew. The court reversed the lower court's decision in favor of plaintiffs, saying:

> There was no underlying statutory duty to offer special protection to plaintiffs' decedents; the failure to inspect in no way added to the risk of injury to the passengers or crew; and there is no evidence that anyone relied on the contents of [the order] and limited their own safety precautions accordingly. Therefore, there can be no basis for liability under general principles of tort law and the Federal Tort Claims Act.

*Id.* at 1145.

In *Howell v. United States*, 932 F.2d 915 (11th Cir. 1991), an FAA inspector was scheduled to provide an annual "check ride" for a pilot, but was told and observed that the plane's fuel was contaminated. The check ride was cancelled, but no further action was taken. Two days later the plane crashed, killing seventeen people. The crash resulted from a loss of power caused by the ingestion of contaminated fuel. The families of the victims claimed the FAA inspector should have taken further action, such as grounding the plane or initiating an investigation into the cause of the contamination. The court affirmed the decision in favor of the FAA, noting first that the FAA inspector did not change a nonhazardous condition into a hazardous one or cause such a change through his action. *Id.* at 919. The court continued:

> Nor can we say the FAA or its inspector undertook to perform a duty owed by the airline to its passengers. Whatever the FAA does or does not do, the Federal Aviation Regulations assign the chief responsibility for ensuring the airworthiness of an aircraft and its crew to the craft's owner, operator, or pilot. *See, e.g.*, 14 C.F.R. §§ 91.163(a), 135.413(a). The duties of the FAA supplement rather than supplant the duties of the airline – duties which the airline could not, and did not, delegate.

Finally, the court found no evidence that the passengers knew about the unplanned "inspection" two days before their flight; thus, they could not have relied on it.

In *Stables v. United States*, 366 F. Supp. 2d 559 (S.D. Ohio 2004), the probable cause of the plane crash was an improperly secured flight control bolt on the plane's elevator assembly. It was improperly secured during a heavy maintenance check by an FAA-certified repair station or during subsequent maintenance by EWA airline personnel. The deceased pilot's widow claimed the FAA was negligent in its oversight and enforcement of its safety regulations and thereby proximately caused his death. The court held the Good Samaritan doctrine had no applicability because "there is no evidence that the FAA undertook to render services to benefit Kevin Stables or that Kevin Stables relied upon the FAA's undertaking with regard to EWA." *Id.* at 571. The court further held that the regulation placing responsibility on EWA for ensuring its aircraft conform to FAA regulations "precludes reasonable reliance by the plaintiff" on the FAA. *Id.*

Applying these authorities to the present motion to dismiss, Comair has failed to show that the FAA undertook to render any "services" to Comair and, thereby, created a relationship with Comair that gave rise to a duty to Comair. The certification of the ACM is analogous to the requirement of a certificate of title in *Florida Auto Auction* or to the surveillance in *Clemente*. There is no service being provided to a particular auction company or airline. There is no evidence that "the purpose of the actor [FAA] was to render a direct service to the person who was harmed [Comair], or to persons of that class." *Roberson,* 382 F.2d at 720. Likewise, the Government activity did not relieve the Airport or Comair of its duties. *Id.* at 721. If a private person voluntarily certified the ACM, it would not be providing a direct service to or have any duty toward Comair.

Additionally, Comair has not shown any manner in which the Government's alleged failure to exercise reasonable care in certifying the ACM *increased the risk of harm* or turned a nonhazardous condition into a hazardous one. *Clemente, Howell*. "The test is not whether the risk was increased over what it would have been if the defendant had not been negligent. Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all." *Myers*, 17 F.3d at 903. Comair has failed to "allege facts showing that the governmental actor affirmatively either made, or caused to be made, a change in the conditions which change created or increased the risk of harm." *Id.* More importantly, Comair does not show how any deficiencies in the ACM were the proximate cause of the harm to Comair. Finally, Comair cannot justifiably rely on the FAA certification of the ACM to limit its own safety precautions. The reliance it claims, without factual support, is that the "Airport relied on the approval of its ACM." [DE 2345, p. 10].

The same analysis would apply to Comair's allegations that the FAA failed to inspect or approve lighting, marking or signage at the Airport or otherwise to oversee the construction and to inspect taxiways and runways for conformance with federal rules during construction. There is no factual showing that the FAA voluntarily assumed any of these duties, much less that its purpose in doing so was to render a service to Comair. Even if such a showing could be made, there is no evidence that the FAA brought about a change of conditions that increased the harm over what it would have been if the FAA had not acted at all. Nor is there evidence of Comair's reliance and resulting reduction of its own safety precautions.

The same is true regarding Comair's allegations in its Complaint that the FAA had a duty to provide accurate information regarding configuration, design, signage, marking or lighting of the Airport to publishers of charts or to provide Comair warnings that taxiways, signage or markings did not correspond with the Jeppesen chart.

For all of these claims, Comair has failed to show the FAA had any duty to Comair or that Comair justifiably relied on any action of the FAA. Accordingly, Comair may not proceed under the Good Samaritan doctrine. State law does not provide for private liability under similar circumstances. With respect to the claims noted in the United States' motion to dismiss, the requirements of 28 U.S.C. § 2674 have not been met, and these claims should be dismissed for lack of jurisdiction. *Myers*, 17 F.3d at 904. Because Comair has not shown any duty or justifiable reliance, it is not necessary for the Court to reach the question of whether any of the claims would fall under the discretionary function exception to the FTCA.

5. The 2-2-1 Schedule

The United States moved to dismiss Comair's claims in paragraphs 13 and 20 of its Complaint that the FAA scheduled insufficient rest time between shifts and required the air traffic controller to work a "demanding and oppressive" schedule that rendered the controller unable to perform his duties. [DE 2137, pp. 3, 34]. It argued that the 2-2-1 schedule worked by the controller on duty at the time of the accident was not prohibited by statute, regulation or local guidelines and fully complied with the requirements of the Facility Operation and Administration Handbook. *Id.* at 16-17. In fact, the uncontradicted evidence is that the 2-2-1 shift is a popular one among controllers and could be arranged by the controllers themselves through trading of shifts. *Id.*, Ex. Q. The United States argued that this schedule fell within the discretionary function exception to the FTCA. *Id.* at 34-36.

Comair devoted much of its response to attacking the decision to have only one controller on duty during the overnight shift, referenced as "mid-shift." [DE 2345, pp. 23-28]. Comair acknowledged that use of the schedule "could have involved balancing these policy considerations under normal circumstances." *Id.* at 28. It argued, however, that "Ortman did not have the discretion to weigh these factors and implement the schedule if that contributed to the inability to comply with the directive to staff the mid-shift with two people." *Id.* Comair also claimed that "it

was the use of this schedule that led *directly* to Damron working alone, after insufficient sleep on the morning of August 27, 2006." *Id.*, emphasis in original. Comair relies on certain pages of the Report of Dr. Cziesler, which support an argument that the 2-2-1 schedule can result in fatigue and poor performance on the part of air traffic controllers. *Id.*, Ex. 31. The United States replied that the 2-2-1 schedule had nothing to do with whether there should have been an increase in staffing at the Lexington Tower. [DE 2424, p. 14].

Based on this evidence, the issue of scheduling appears to be intertwined with Comair's allegations regarding "negligence on the part of the federal air traffic controller who provided services to Flight 5191 on August 27, 2006," which the United States expressly said were not the "subject of this motion." [DE 2137, p. 2]. While it appears that the use of a 2-2-1 schedule may fall within the discretionary function exception, it is premature at this time to make that decision. It is the opinion of this Court that the claims regarding the 2-2-1 schedule and its impact on the controller on duty should be considered at trial. The Court reserves consideration of the discretionary function exception pending presentation of the evidence at trial.

## III. CONCLUSION

The Court, being otherwise fully and sufficiently advised, **HEREBY ORDERS**:

A. The United States' motion to dismiss for lack of jurisdiction [DE 2137] Comair's claims regarding the 2-2-1 schedule are **PASSED** pending consideration of the evidence at trial; and

B. The United States' motion to dismiss for lack of jurisdiction [DE 2137] all remaining claims raised in the motion is **GRANTED**.

This June 11, 2008.




**Signed By:**
***Karl S. Forester*** KSF
**United States Senior Judge**