UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON


CIVIL ACTION (MASTER FILE) NO. 5:06-CV-316 - KSF


IN RE: AIR CRASH AT LEXINGTON, KENTUCKY, AUGUST 27, 2006


RELATING TO:

*Hebert, et al. v. Comair*, et al., No. 5:07-CV-320


OPINION AND ORDER

\* \* \* \* \* \* \* \* \* \*

This matter is before the Court on the allocation of attorney's fees among former and

present counsel for the Plaintiffs, Jamie, Lauren and Mattie-Kay Hebert.[1]  The issue having been

fully briefed, it is ripe for consideration by the Court.

I.      INTRODUCTION

In this case, none of the teams of attorneys who represented Plaintiffs will be adequately

compensated for their time and effort.  Plaintiffs abruptly changed counsel teams twice, resulting

in much reinventing of the wheel.  Plaintiffs also were very demanding and uncooperative.

Moreover, Plaintiffs adamantly refused to accept any settlement offer.  Every other one of

the Flight 5191 forty-nine passengers and crew members, who had some of the best aviation

counsel in the nation, reached a settlement agreement that they thought was fair.  The

overwhelming majority of these settlements were reached prior to August 2008, almost three years

ago.  By contrast, these Plaintiffs, after a jury verdict of $7.1 million for compensatory damages and

warnings that the Court was having serious second thoughts on the availability of punitive damages

and that the size of the underlying verdict was not likely to survive on appeal, still refused a

settlement offer of $8.1 million.  As a result of the changes in counsel, the refusal to settle and

_____

[1]  For clarity, the Plaintiffs are referenced by their first names, rather than their last name.

other factors discussed below, unusually large amounts of time and effort by all counsel were necessary. Because Plaintiffs dispute their former counsels' entitlement to any fees, it is necessary to detail the circumstances leading up to the termination of their services.

## II.    BACKGROUND

### A.    Plaintiffs' First Counsel Team

On Monday, August 28, 2006, one day after the crash of Comair Flight 5191, Jamie Hebert's mother, Linda Hebert, contacted Carl Duhon of Lafayette, Louisiana, for immediate assistance for Jamie to take charge of Bryan Woodward's body and his estate.[2]  That same day, Mr. Duhon and attorney Elwood C. Stevens had a conference call with Jamie, who stated that she was not married to Bryan Woodward, but they had lived together for many years and were the biological parents of Lauren and Mattie-Kay. [DE 3896-2].  Later that day,  Duhon and Stevens had another conference call with Jamie in which they advised her that neither Louisiana nor Kentucky recognized "common-law marriages."  Accordingly, they advised that she could assert tort claims on behalf of her minor children, but not any claim on her own behalf.

On August 29, 2006, Duhon's firm filed court documents in the Parish of Vermilion, Louisiana, for Jamie to be appointed Tutor of her children and Administratrix of Woodward's estate, along with an Affidavit of Death, Domicile and Heirship. [DE 3625, Ex. A, B].  Each of these documents state that Jamie was the "common-law wife" of Woodward and "no marriage ceremony was held before a civil or religious authority," or that Woodward was her "common-law husband" and no marriage ceremony was ever held.  These documents stated that the signer had read them and believed the allegations of fact were true.  They were signed under oath by Jamie's mother, Linda Hebert, and her sister-in-law, Allison Hebert.  Duhon testified during his deposition that this

---

[2]  Bryan Woodward had long been estranged from his family, but his mother, Ramona, arrived quickly in Lexington and claimed his body with the intent of cremating it.

information regarding marital status was obtained directly from conversations with Jamie. [Duhon Depo. pp. 33-34].

On August 30, 2006, Duhon arrived in Lexington at Jamie's request and worked to obtain release of Woodward's body. On August 31, Jamie signed an Attorney Employment Contract in which she retained the Duhon Law Firm "to assist in the prosecution of the claim" and to represent Jamie and her minor children "as legal counsel for all purposes, including, but not limited to Succession and Tutorship proceedings in connection with the airplane accident...." The contract provided that the Duhon Law Firm was to receive "a fee out of the gross recovery of 33%." [DE 3877, Ex. 1A]. In support of his claim for attorney fees, Duhon provided voluminous documents reflecting communications to and from Jamie during the months of September 2006 through March 2007 regarding the crash litigation. [DE 3897, 3898, 3899 and 3900].

Duhon contacted David Wise of Burke, Mahoney and Wise,[3] Chicago, Illinois, whom Jamie retained on September 7, 2006, jointly with Duhon, to represent Plaintiffs "as legal counsel in the prosecution of all claims including but not limited to wrongful death and survival claims and all court proceedings ... in connection with the airplane crash which occurred on August 27, 2006 ... and resulted in the death of Bryan Keith Woodward...." This Attorney Employment Contract provided "a fee out of the gross recovery of 33 1/3% of any monies received whether by settlement, trial or otherwise...." The fee was to be split equally between the Duhon Law Firm and Burke, Mahoney & Wise. [DE 3851, Ex. 2]. The Lexington firm of Miller, Griffin and Marks ("MGM") was retained as local counsel.

Duhon's contemporaneous, handwritten notes from a meeting or phone conversation with Jamie approximately on September 3, 2006, reflect that she said she and Bryan Woodward lived together twenty-one years as a family, but were "never married." [DE 3897, Ex. B4]. During a September 5, 2006 meeting among Jamie, Duhon and Carl Devine of MGM, Duhon's notes reflect

_____

[3] Neither David Wise nor Burke, Mahoney and Wise have claimed any fees in this case.

that Jamie and Bryan moved in together on September 3, 1986, but "Bryan did not want Jamie to be a part of his family." They "always presented themselves as a married couple." *Id.* As a result of this meeting, Devine prepared a Memorandum dated September 16, 2006, in which he concluded that "[a] co-habitant does not have the ability to pursue a wrongful death/loss of consortium claim in Kentucky unless the parties' common law marriage is recognized by their home state." *Id.* This memo was transmitted to Jamie and later discussed with her. She was upset she would have no claim for damages and even more upset that her children would learn her secret that she and Woodward were not married. [DE 3896, p. 5].

Duhon, Wise and MGM's Michael Cox drafted Plaintiffs' Complaint, which was filed in Kentucky state court twelve days after the crash. [DE 3897, Ex. B7]. The Complaint asserted claims against various Comair entities for wrongful death, survival action, and punitive damages. Counsel listed on the Complaint were David Wise, Carl Duhon and MGM's Thomas Miller.

Subsequently, Duhon obtained two additional autopsies because of Jamie's urging. He also established paternity of the children. Duhon attended a September 26, 2006 Status Conference in this Court and the September 27, 2006 inspection of the airport with Jamie's knowledge. [DE 3987, Ex. B8, September 21, 2006, 8:14 p.m.]. He also attended the November 20, 2006 Status Conference with her knowledge. [Ex. B30, November 15, 2006, 2:43 p.m.]. After sending Jamie several photographs from the airport inspection, Duhon said Jamie suggested they use Google Earth for views of the airport. [Ex. B10, October 2, 2006, 2:57 p.m.]. In multiple emails, Jamie said she wanted to be apprised of everything regarding the lawsuit and that she appreciated Duhon's transmission of copies to her. [See, e.g., *Id.* at September 27, 2006, 8:55 p.m.; Ex. B20, October 12, 2006, 9:12 p.m.; October 13, 2006, 10:05 p.m.; Ex. B21, October 16, 2006, 9:41 p.m.].

On several occasions, Jamie asked Duhon to obtain photographs or videos for the jury. [For example, Ex. B10, October 1, 2005, 1:45 a.m., obtain photograph of flowers Comair sent ("That would look marvelous sitting on a table, along with the self-help books that were provided

at the base hotel, in front of the jury.  What a joke-"); Ex. B12, October 7, 12:05 a.m., obtain videos of Woodward at Lafayette and Texas airports ("I think it's relevant for the jury to see him on the full journey in a working capacity away from his family, that type of thing.[4]  We have to bring an individual to the jury a real person, a person who was alive"); Ex. B27, November 1, 2006, 9:00 p.m. ("How do we get [photos from the scene], because somebody has them.  Get the other attorneys on this issue if any aren't already on it"); Ex. B30, November 14, 2006, 9:06 p.m. ("Carl, did you obtain copies of the original calls to the scene?")].

She was emphatic that she wanted to be in charge of litigation strategy.  "Right now, Carl, I haven't met everybody, and if we do not see eye to eye on important issues, I will be going with somebody else."  "In addition, I won't be settling so, if that is a question that the 'majority' will decide upon, count me out on many things to come."  Ex. B17, 7:27 p.m.  "When you say Barry was detained [sic], did these fellas already detain [sic] him, because if that's the case, I can't agree to anything like that.  I have to be in on the decision of who will be detained [sic].  I do not want those decisions being made for me."  "I have no intention of being part of any mediation."  "I think this case is huge, and I don't like the fact of other people looking for experts for me, long distance, and deciding those things without my input." [Ex. B23, October 18, 2006, 7:23 p.m.].

Jamie repeatedly asked about claims on her behalf and complained that her status was not being recognized.  On October 8, 2006 at 11:58 a.m., Jamie wrote:  "Ok, Carl, am I correct in understanding that these men are trying to connect me individually/-personally?" [Ex. B15].  Duhon responded: "Yes everyone is trying to connect you individually to bring a claim."  *Id.* at 1:12 p.m.  On October 9 at 7:27 p.m., Jamie wrote: "Carl, I will also bring attention to the fact that after weeks with the lawyers you chose, I am still not being recognized.  I am *not* his next friend, Carl.  I'm not his friend.  That was my husband, no matter what anybody wants to call it on paper."  [Ex. B17].

---

[4]  Jamie had a habit of inserting ellipses, especially in place of commas.  For clarity, the Court deleted them from quotations of her text when no words are omitted by the Court.

Later, she wrote: "In essence, if my legal team is having an issue with my standing, then the 12 people that I do not know will equally be confused." *Id.* at 8:40 p.m.

Regarding their tax returns, Jamie said she "refused to file as married on the federal document. I guess I considered that something that we had to file separately on." [Ex. B23, October 18, 2006, 9:16 p.m.]. On October 23, Jamie wrote: "I learned something this past weekend about the property in Vermilion Parish. Bryan signed his portion over to me just weeks after it was donated to both of us by my parents.[5] I have the old papers where we were both listed as the owners, if that would be useful at all in proving our existing relationship." [Ex. B24, October 23, 2006, 1:11 p.m.]. Later that day, Jamie said she "had about thirty minutes to do some research into my lack of spousal naming in this venture," and she copied text from Wikipedia regarding recognition of a "putative spouse." [Ex. B25, 8:30 p.m.]. Duhon responded that Louisiana does not recognize "putative spouse," but that Ike Huval was doing some in-depth research on Louisiana law and he would check on the status of Huval's memo. *Id.* at 9:06 p.m. The next day, she wrote: "I just need to know someone is working on this for me.... Honestly, not being recognized is very difficult for me. ... I'm thinking *the way we lived would be viewed by a judge as being married*, even if it held the putative spouse labeling...." [Ex. B25, October 24, 2006, 10:00 a.m., emphasis added]. Shortly thereafter, she wrote that "it's probable I could be recognized," but she changed her mind that evening after reading further. *Id.* at 10:30 a.m. and 8:43 p.m. She asked Duhon to tell Ike to "look for something else." She continued: "I did it to myself; I understand. It's just so hard for me to come to grips with, because we did not have just any kind of relationship." *Id.* at 8:43 p.m.

---

[5] On September 9, 2003, Jamie's parents deeded a portion of their property jointly to Jamie and Bryan, each as single persons. On July 16, 2007, Jamie recorded an Act of Donation, purportedly signed by Bryan on December 5, 2004, deeding his interest in the property to her. The Donation is dated a year after the deed. Two years later she claimed she just learned of it.

On November 2, 2006, Duhon sent Jamie the "memo Ike prepared per your request." [Ex. B28 at 8:20 a.m.; Ex. B26, October 25, 2006]. This memo details the requirements for recognition of a marriage under Louisiana law, including that "the parties must participate in a marriage ceremony performed by a third person who is qualified, or reasonably believed by the parties to be qualified, to perform the ceremony. The parties must be physically present at the ceremony when it is performed." [Memo, p. 2]. He explains that, if the marriage requirements in Louisiana were met, the marriage would be recognized in Kentucky. However, because "they did not 'celebrate' their marriage in Louisiana, the law of Louisiana does not recognize them as married." *Id.* at 4. At 8:46 p.m. on November 2, Jamie says to thank Ike for his work, which she will read later, and then asks "if the spousal issue is cleared up?" and if "we need to acquire another attorney to argue the putative spouse issue?" Duhon says Ike Huval's Memo was given to Jamie and discussed with her. [DE 3896, p. 10; DE 3877, Ex. 1D].

The "spousal issue" is not mentioned again in emails for several weeks. Between documents dated November 30 and December 1, 2006 is a handwritten note by Duhon saying, "Jamie did not want to have these documents at home because she did not want the children to find out she and Bryan were never married." [Ex. B31]. On December 3, she tells Duhon she "had to sneak that binder into the truck when the girls were taking their baths." She thanks Duhon for letting her "know what was in there." *Id.* at 9:51 p.m.

During this time, much distraction was created by a letter from an attorney representing Bryan's mother, Ramona Keene, stating that Bryan and Jamie were never married, that Bryan's name was not on the children's birth certificates, that the children had never used his name, and that there was no presumption they were his children. [Ex. B31, November 29, 2006]. The letter demanded proof they were his children or, absent proof, asserted that Ramona Keene should be named the Administratrix and the beneficiary of Woodward's estate. Jamie believed Ramona was

claiming that Brett, Bryan's brother, fathered the children; Jamie advised Duhon that Brett was willing to sign a legal document that they were not his children.  *Id.*, December 5, 2006, 10:18 p.m.

The next time marriage came up in emails between Duhon and Jamie was on December 8, 2006 at 10:05 a.m. [Ex. B32].  Jamie referenced the document for Brett to sign and asked Duhon to include something like: "My brother, Bryan Keith Woodward, was married to Jamie Hebert, and they had two children....  In essence, that would be the acknowledgment of marriage by at least one member of his family."  Jamie included a "good news" postscript that read:

> I had another lawyer review the status of my marriage paper, and he said the paper I possess cannot be denied and the state of Louisiana acknowledges my marriage, which should have never been up for debate.  He said it is not now nor ever will be disputed by this state.  The ceremony we had is legal and if needed, I have the authorization I need in a court of law.  He said I do not need the title of putative spouse, because I am or was his legal spouse.

[Ex. B32, December 8, 2006, 10:05 a.m.].  On December 12, Jamie again complains that the draft document Brett is to sign "doesn't mention my marriage."  She also said "[m]y marriage is 'solidly recognized' in this state, which means it IS recognized by the state of Kentucky." [Ex. B32, December 12, 2006, 9:37 p.m.].  On December 13, Duhon asks Jamie to please "bring the document you are referencing to the meeting tomorrow so I can look at it." [Ex. B32, December 13, 2006, 8:59 a.m.].

On December 14, 2006, apparently after the meeting with Jamie, Duhon wrote a Memo To File on the Marriage Certificate Issue.  He said Jamie "was thinking of having a 'friend' she knew in government obtain a marriage certificate for her."  He advised her that "obtaining a forged marriage certificate would be a criminal offense...."  He also said "if she did anything like that, we would no longer be her attorneys because we would not let ourselves become involved with anything criminal, and her obtaining a forged marriage license would be criminal." [Ex. B33, December 14, 2006].

Two days later, Jamie said she does not "know how much longer I can continue with Dave [Wise] without knowing what work Dave is doing up there."  She adds: "The contract will have to

be revised, Carl." She says she knows "I need other representation," but adds she is "not saying Dave is inadequate because I just don't know what he's working on." Next, she laments:

> [I]t makes no sense that I've had to seek outside help when I have attorneys. Honestly, as I told you in your office, I don't care how things got screwed up. It's not hard for me to realize that me and my family were not in their right mind when all that took place. I don't remember most of it, and the attorneys that I sought to fix things said "We will fix things, Jamie, if you drop Carl." Carl, I'm trying not to do that, but you gotta help me, Buddy. I can't have my own counsel working against me....

[Ex. B33, December 16, 2006, 11:00 a.m.]. She said she had taken up for Duhon "since you didn't see the document and I didn't remember about the document Mom had when Bryan gave his portion of the land to me. We have that document, by the way...." *Id.* She said they advised her not to provide Duhon the "marriage document." On Monday, December 18, Duhon responded that he would help her, "but I need to see the document you are referencing." [Ex. B33, December 18, 2006, 8:59 a.m.]. Jamie replied that Brett's document "does not have our marriage stated properly." Regarding Duhon's request for the marriage document she said:

> As for you getting that document, I don't have it like I said. The firm that does have it does not believe you should handle anything in regards to the lawsuit because of the things that already have to be corrected. The [point] is, Carl, I already have the legality of the document. There is no need for me to hand it to you for you to have an opinion on it.

*Id.* at 9:15 a.m.

Thereafter, the emails and documents do not discuss the "marriage issue." Instead, the comments relate to litigation strategy. Duhon continued to email updates, but Jamie responded less and less. On February 13, 2007, Jamie sent Duhon a letter by Certified Mail stating that "the current contract is cancelled," that it "was signed under genuine duress and was thought only to be a contract to open the succession in Louisiana in order to effectively retrieve bodily remains from the state of Kentucky. Serious shock and a lack of proper follow-up communications allowed the contract to continue despite regular questioning of certain procedures." [Ex. B41, letter marked Ex. 1C]. On April 13, 2007, the Hebert case and many others were remanded to the Fayette Circuit

Court for lack of jurisdiction. This Court has no record of Duhon's withdrawal from the case, but his billing records reflect preparation of motions to withdraw around this time. [DE 3877, pp. 58-59]. Duhon's Notice of Attorney's Lien was filed July 31, 2008. [DE 3228]. He claims fees in the amount of $127,942.00 for his time at a rate of $150 per hour and $153 per hour for Huval. [DE 3851, p. 3].

In opposing Duhon's request for attorney fees, Jamie claimed Duhon was discharged for cause. In particular, she says she discharged him because:

A. He was not qualified to handle the aviation case;
B. He told me he was going to get 50%, and I did not and do not agree this was fair or appropriate;
C. I was completely dissatisfied with the quality of Mr. Duhon's work;
D. I really thought Mr. Duhon's role was limited to helping us get the body back and finishing the succession;
E. I came to realize over time Mr. Duhon was misleading me;
F. I now know the whole time Mr. Duhon was working this situation for his own best interests and not my family's; and
G. I completely lost faith and trust in Mr. Duhon for all of these reasons.

[DE 3890, p. 5]. To support this claim, Jamie Hebert attaches her affidavit, several emails dated after the letter discharging Duhon, and one email from Duhon dated September 26, 2006 regarding Woodward's life insurance, wages, and workers' compensation. Her affidavit states that Duhon repeatedly stated his desire to work on a case against the airline, but she "always told Mr. Duhon no" because she "wanted that case in the hands of specialists when the time came" and she did not consider Duhon qualified. *Id.* at 3.

Jamie also attaches unsworn statements from herself, her mother, her father, her older daughter, and Deborah Waters who is identified only as "family of Bryan Woodward." [DE 3890, JH Aff. Ex. 2]. These statements contend that Jamie did not hire Duhon for the wrongful death suit and that she was in shock. Lauren states she attended many meetings with Mr. Duhon, and they always ended with Jamie "telling Mr. Duhon that he did not have her permission to work in any aspect with the litigation." Lauren claims to have heard Jamie "verbally discharge him about 6 weeks after the crash occurred." *Id.* These statements do not satisfy the evidentiary requirement

10

of 28 U.S.C. § 1746 that unsworn statements must be subscribed as true under penalty of perjury. Accordingly, they will not be considered by the Court. *See Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363 (6th Cir. 2001)(District Court properly disregarded a letter because it was an unsworn statement).

## B. Plaintiffs' Second Counsel Team

Mary Schiavo of Motley Rice LLC was first contacted by Jamie Hebert on March 7, 2007. Jamie forbade her to speak to Duhon. [DE 3861, p. 2]. A finalized attorney contract was sent to Jamie June 19, 2007, but she insisted on a reduction of the contingency fee to 15 percent. Schiavo later agreed, and the revised agreement was executed on July 16, 2007. *Id.*, Ex. 2. Albert B. McQueen, Jr. of Wilson, Polites & McQueen was retained as local counsel.[6] Motley Rice agreed that the amount of attorney's fees "will not be increased by the work of co-counsel...." [DE 3861-2].

Schiavo states Motley Rice did not keep time sheets, but does have detailed records of work and action in the case. *Id.* at 3. She generally summarizes the work as including filing Federal Tort Claims Act notices with the federal government, drafting and filing two complaints and one amended complaint, handling discovery, selection of experts, and preparation for trial. *Id.* at 3-4. She also obtained Social Security and Worker's Compensation benefits for the children. *Id.* at 3, n. 1. During Schiavo's representation, a Plaintiffs' Steering Committee, comprised of counsel for all passengers, allocated responsibilities for briefing various issues, attendance at depositions, selection of expert witnesses, and the like. [DE 284 and amendments].

Motley Rice also undertook substantial legal work and investigation to determine the factual basis of Jamie's claim of marriage. Motley Rice said this issue was important to determine if the evidence Jamie offered was supported by the facts, to obtain a guardian other than Jamie because of the serious conflict with her children, and to determine if the claim of marriage should be withdrawn from the case. *Id.* at 4.

---

[6] For convenience, both firms are referenced collectively as "Motley Rice."

Jamie refused to cooperate or communicate about the issue. Accordingly, Motley Rice reexamined documents and files in search of evidence. They examined check registries, looked through photographs for evidence of wedding rings, spoke with Parrish clerks in search of license applications, requested tax returns and repeatedly requested other information from Jamie to support her claim. *Id.* at 5; DE 3917, pp. 13-18. They advised that the notary public, whom Jamie claimed performed the ceremony, was not authorized to perform marriage ceremonies. [DE 3917-1, p. 3]. Finally, they hired a former FBI handwriting analyst to examine Bryan Woodward's alleged signatures on the Act of Donation and the Affidavit of Matrimony. The expert opined the signatures of Bryan Woodward were not authentic. [DE 3861, p. 5].

At that point, Schiavo admonished Jamie in writing repeatedly that she was jeopardizing not only her claim, but also the claims of her children. [DE 3917-1, letters dated May 15, 2008; May 19, 2008; June 2, 2008; June 13, 2008]. Schiavo warned that, if the documents on which Jamie relied, were determined to be inaccurate, Jamie could be subjected to other legal penalties. *Id.*, May 15, 2008. Schiavo advised that she could not argue the marriage claim in court because of the lack of evidence to support it and the existing evidence to the contrary. With the August 4, 2008 trial on liability and pretrial deadlines looming, Motley Rice gave Jamie a June 6, 2008 deadline to proceed without the marriage claim or to relieve them of their duties as counsel. [DE 3917-1, letter dated June 2, 2008]. When Jamie would not follow their advice and resolve the conflict with the claims of her children, Motley Rice moved to withdraw from the representation. [DE 2768]. The motion to withdraw was granted June 28, 2008 and a Notice of Attorney's Lien filed on July 8, 2008. [DE 3003, DE 3098].

Jamie's refusal to cooperate with Motley Rice on other issues is evident. On April 30, 2008, Motley Rice wrote that a meeting with psychological experts was scheduled for May 12. [DE 3917, p. 19]. On May 5, 2008, Schiavo wrote that she had been trying repeatedly through various means to contact Jamie regarding deadlines to disclose expert witnesses and to schedule depositions

regarding the girls' damages claims.  She had made arrangements for evaluations of the girls by a forensic psychiatrist and a psychologist on May 12 and 13 and was attempting to confirm the meeting with Jamie and the girls on May 11 and their proceeding together to the evaluations.  [DE 3917-1, May 5, 2008].  She also requested releases for the girls' school records prior to depositions duces tecum scheduled by Comair for May 15.  Ongoing discovery and upcoming pretrial deadlines were also noted.  *Id.*  On May 8, 2008, Schiavo advised that she still had not heard from Jamie, and the experts could not hold their calendars open any longer.  She noted the May 30 deadline for expert reports and that filing a general report without evaluations could weaken the children's claims. [DE 3917-1, May 8, 2008].  Jamie emailed that she did not like the experts Motley Rice obtained and that she wanted to find real experts. [DE 3917-1, May 15, p. 5]

Jamie refused other attempts by Motley Rice to visit or call.  She insisted on communicating through email because she said she could not talk on the phone without crying.  On October 4, 2007, she wrote: "I honestly cannot work around deadlines."  "I don't care how it appears if I don't meet one of their deadlines." [DE 3917, p. 18].  On May 13, 2008, Jamie wrote that she could not read other emails from Motley Rice now and was "no good on the phone."  Jamie advised that she also would not open FedEx packages from them.  *Id.* at 21.

Jamie claims the attorney/client relationship had fallen apart by May 2008 because Schiavo had never met with her in person and delegated most contacts to a non-attorney. [DE 3910, p. 16, n. 10].  It appears the relationship never got off to a good start and went downhill from there.

Motley Rice estimated the work on the case consumed a total of 2657.69 hours. [DE 3861, p. 7].  It urges that its expert on pain and suffering testified beneficially at trial; however, that expert did not testify. [DE 3910, p. 18].  The total claim for fees is based on its 15 percent contingency contract.  Motley Rice says it received a settlement offer of $3,500,000.00, 15 percent of which would be $532,500. [DE 3861, p. 7].[7]  Alternatively, it claims entitlement to 15 percent of the entire

---

[7]  Later, Motley Rice said this offer was made after they had withdrawn. [DE 3917, p. 22].

$7.1 million verdict, which is $1,065,000.00, or a *quantum meruit* amount of $1,158,269.00 at a partner rate of $650 per hour and an associate rate of $450 per hour. *Id.* Motley Rice notes: "we also realize that the amount of fees is limited by the size of the verdict and the number of counsel who have worked on this case, and we accept that this Honorable Court will of necessity adjust the rates." *Id.* These claims were modified somewhat in later briefing.

### C. Plaintiffs' Third Counsel Team

On July 31, 1008, Jamie signed a retainer agreement with the Rapoport Law Offices, P.C. [DE 3909-1]. The Plaintiffs' Steering Committee was dissolved August 4, 2008, after settlement by other passengers and was no longer available to share the workload.

On November 20, 2008, Jamie Hebert filed in Bryan Woodward's Louisiana probate case a Petition to File Corrected Affidavits to Establish Heirship.[8] [DE 3631]. Attached were the affidavits of (1) Sonny Serigney, a Baptist minister from Grovetown Georgia, who claimed he performed a marriage ceremony between Jamie Hebert and Bryan Woodward on December 5, 2004; (2) Kelly Hebert, Jamie's brother, who claimed he attended and witnessed the wedding ceremony; (3) Peggy Barrois, Jamie's Aunt, who said she attended and witnessed the wedding ceremony; (4) Janet Breaux, a friend of Jamie's mother and a notary public, who claimed she attended and witnessed the ceremony and, at its conclusion, notarized the signatures of Jamie Hebert and Bryan Woodward on an Affidavit of Matrimony;[9] (5) Linda Hebert, Jamie's mother, who said she was present and witnessed the marriage ceremony, and she had not read the documents she swore to on August 29, 2006 that stated there had never been a marriage ceremony; (6) Allison Hebert, Jamie's sister-in-law, who said she also attended the wedding ceremony in 2004, and she did not read the document she swore to on August 29, 2006 that stated there had never

---

[8] There is nothing in the record that Rapoport assisted with these affidavits or filings. Jamie frequently referred to "other lawyers" helping her, whose identity she kept secret.

[9] Mr. Serigney's name and signature are not on the Affidavit of Matrimony, however.

been a marriage ceremony; and (7) Jamie Hebert stating that she and Bryan Woodward were married on December 5, 2004 by Reverend Sonny Serigney, that the foregoing persons attended, and that Bryan Woodward signed the Affidavit of Matrimony. *Id.* Based on these affidavits, the Louisiana probate court held on December 3, 2008 that Jamie was married to Bryan Woodward and is his surviving spouse. *Id.* The Kentucky probate court ruled on March 27, 2009 that the Louisiana decision "is to be given full faith and credit in the Kentucky probate action." *Id.*

On October 1, 2009, the Supreme Court of Kentucky overruled prior precedent and held that a loss of spousal consortium claim continues after the death of an injured spouse. *Martin v. Ohio County Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009). On October 7, Jamie moved to reinstate her loss of consortium claim previously dismissed based on the now-overruled line of authority. [DE 3609, 3610]. The spousal consortium claim was reinstated October 9, 2009. [DE 3613].

Comair moved to add expert witnesses regarding the reinstated claim and to take the depositions of Carl Duhon and Ike Huval regarding the documents filed in 2006. [DE 3623, 3625]. The Duhon and Huval depositions were taken on November 18, 2009 [DE 3672], and on the next day, counsel gave notice that Jamie Hebert "withdrew her claim for damages for the loss of the services, assistance, aid, society, companionship and conjugal relationship of Bryan Keith Woodward." [DE 3678].

The damages trial proceeded as scheduled on December 1, 2009 and resulted in a verdict on December 7, 2009 as follows:

The destruction of Bryan Keith Woodward's power to earn money: $1,350,000.

Bryan Keith Woodward's physical pain and mental suffering, if any: $750,000.

Compensation for Mattie-Kay Hebert's loss of consortium from the date of her father's death through her 18th birthday: $3,000,000.

Compensation for Lauren Hebert's loss of consortium from the date of her father's death through her 18th birthday: $2,000,000

[DE 3693].

A trial on the issue of punitive damages was scheduled for July 19, 2010. [DE 3753]. At a June 22, 2010 Pretrial Conference, the Court learned that Comair had submitted the Affidavit of Matrimony and the Act of Donation, purportedly signed by Woodward, to experts who "concluded they were forgeries."[10] [DE 3797, p. 11]. The Court removed Jamie Hebert as Next Friend for Mattie-Kay and appointed David Royse in that capacity. [DE 3793]. Mr. Royse was Liaison Counsel for the plaintiffs in the crash litigation and was more familiar than anyone with the claims and defenses of the parties and the work of the Plaintiffs' Steering Committee. Mr. Royse was appointed Mattie-Kay Hebert's Conservator by the Fayette District Court. [DE 3823]. He continued in that capacity until Mattie-Kay was declared emancipated at age sixteen by a Louisiana Court on December 21, 2010. [DE 3828]. Through no fault of the parties, it was necessary for the Court to continue the trial on punitive damages virtually on the eve of trial and reschedule it for February 1, 2011. [DE 3815].

Throughout this case, Comair sought dismissal or summary judgment on all punitive damage claims. [DE 1325, 3478, 3827]. The motion was denied by Opinions dated June 8, 2008 and May 28, 2009. [DE 2488, 3550]. At a Pretrial Conference on January 13, 2011, the Court advised it was reconsidering its decision and continued the trial generally. [DE 3838]. Summary Judgment on punitive damages in favor of Comair was granted February 2, 2011. [DE 3840].

Rapoport provided a copy of his Retainer Agreement in which Jamie Hebert agreed "to pay as legal fee 15% of all amounts recovered." [DE 3909-1]. The Agreement also contains a "fee enhancing and limiting provision" as follows:

> The parties agree all attorney lien claims by predecessor counsel, and all fees of associate counsel, will be paid out of the proceeds of the 15% legal fee. However, if these claims by other attorneys, in the aggregate, exceed 7.5% of the amounts recovered, the fee percentage shall be raised by an appropriate percentage so that Rapoport Law Offices, P.C.'s legal fee free of claims by other counsel will be 7.5%. But, in no event, shall the total of all legal fees and expenses exceed 25% of the amounts recovered.

---

[10] These experts were in addition to and independent from the Motley Rice expert.

*Id.* Rapoport compares the duration of representation of the three legal teams and notes that his offices represented the Heberts for a substantially longer time. [DE 3910, p. 2]. He compares the total attorney hours claimed by each of the teams, after reducing Motley Rice from 2657.69 hours to 993.77 hours because he says "the numbers don't add up," and argues that he has contributed significantly more time (7470.4 hours). *Id.* at 3-4. He also demonstrates that his team advanced over three times more in expenses. *Id.* at 5-6. Under this hourly analysis and assuming all claims are correct and services of equal value, Rapoport argues he would be entitled to 78.15 percent of available fees; 10.4 percent for Motley Rice; 9.12 percent for Duhon; and 2.33 percent for Wilson, Polites and McQueen. He then argues the value of the services provided.

Relying on *Boone v. Coe*, 153 Ky. 233, 154 S.W. 900, 902 (1913), Rapoport urges that only the "valuable" work counts for purposes of determining an award of fees. He particularly argues that the client received very little benefit in terms of recovery of a fund from the work by Duhon or Motley Rice. He notes that little damages discovery had been exchanged when he became involved in the case. *Id.* at 14. The expert witnesses who testified at trial were all hired by Rapoport, except Professor Baldwin, who was hired by all Plaintiffs. Even Prof. Baldwin had to prepare a revised report after Rapoport talked with Woodward's boss, Jeffrey Talley, and learned of a significant promotion and pay raise that Woodward's employer would probably have given. *Id.* at 15-16. Rapoport argues the existence of Baldwin's initial report with its low estimates caused problems at trial that may have reduced the loss of earnings verdict. *Id.* at 16-17. Rapoport also notes that no prior counsel talked with Dr. Corey, who conducted the official autopsy on Woodward and testified about findings consistent with his breathing in the post-crash fire. This was crucial testimony leading to an award of $750,000 for physical pain and mental suffering. *Id.* at 17.

Rapoport concludes that more than 90 percent of the valuable work was done by his firm. Five percent or less was done by Motley Rice; 2.5 percent or less by Duhon; and 2.5 percent or less by Wilson, Polites and McQueen. [DE 3910 at 18]. Finally, Rapoport considers the factors in

Rule 1.5(a) of Kentucky's Rules of Professional Conduct for determining the reasonableness of a legal fee and argues that those factors weigh heavily in his favor. *Id.* at 18-20].

## III.    ANALYSIS

### A.    The Marriage Issue

Mr. Rapoport claims that the "marriage issue" or "fraud argument" is merely a "red herring" in at attempt to boost the fees to which former counsel may be entitled. [DE 3910, pp. 20-23]. With respect to any potential criminal proceedings, Rapoport is correct that those issues are not relevant here. However, for purposes of determining whether Mr. Duhon was discharged for cause and whether the second trial team withdrew "with just cause," the marriage issue is very important.

Kentucky law is clear that "when an attorney employed under a contingency fee contract is discharged without cause before completion of the contract, he or she is entitled to fee recovery on a *quantum meruit* basis only, and not on the terms of the contract." *Baker v. Shapero*, 203 S.W.3d 697, 699 (Ky. 2006) (overruling *LaBach v. Hampton*, 585 S.W.2d 434 (Ky. App. 1979)). Similarly, "an attorney who voluntarily withdraws from representing a client under a contingency fee agreement is entitled to remuneration for services rendered under the doctrine of *quantum meruit* if the withdrawal was with just cause." *Lofton v. Fairmont Specialty Ins. Managers, Inc.*, ___ S.W.3d ___, 2010 WL 4025920 (Ky. Ct. App. 2010) (motion for discretionary review pending).

#### 1.    Duhon Was Not Discharged for Cause

Whether Bryan Woodward and Jamie Hebert were legally married under Louisiana law was an issue from the very outset of Duhon's representation. Jamie could not claim Bryan Woodward's body because she had no proof they were married. It strains credibility beyond the breaking point for Jamie to have argued with Duhon for nearly six months over whether she could bring a personal claim against Comair, that her status was "not being recognized," about her "lack of spousal naming in this venture," and her eligibility as a putative spouse if, in fact, there had been a marriage ceremony less than two years earlier. If there had been a marriage ceremony so recently, why

would she write to Duhon on October 24, 2006, "I'm thinking the way we lived would be viewed by a judge as being married, even if it held the putative spouse labeling"? [Ex. B25, 9:55 a.m.]. Why would she tell Duhon that she did not want to have certain "documents at home because she did not want the children to find out she and Bryan were never married"? [Ex. B31, handwritten note after November 30]. Why did she explain on December 3 that she had to sneak that binder to Duhon and that she appreciated him letting her know what was in it. [Ex. B31, December 3, 2006, 9:51 p.m.]. Why would Elwood Stevens, an attorney who has nothing to gain or lose in this matter, provide an affidavit that Jamie told him and Duhon shortly after the crash that she and Bryan were not married? [DE 3896-1]. [See also Ex. B4, September 5, 2006 handwritten notes in which Jamie is telling Duhon and Carl Devine that she and Bryan never married].

Jamie's self-serving statements in her current affidavit are refuted by the record of her contemporaneous conduct and emails. The following statements are just one example: "I have never read the contracts shown by Mr. Duhon. At some point much later he told me he would receive half of any recovery and I told him he was mistaken...." "I have never read the documents I signed for Mr. Duhon to this day." [DE 3890, pp. 3-4]. Yet, on December 16, 2006, she wrote Duhon that "[t]he contract will have to be revised," and on March 21, 2007, she said: "You won't receive half of the third. I'm not sure how that works, but that much I do know." Half of a third was the exact amount Jamie agreed to pay Duhon under the contract she signed with Dave Wise. [DE 3851, Ex. 2]. How would Jamie know the precise contract percentage and why would she say the contract had to be revised if she was not familiar with its terms? Perhaps this is a game of semantics, and someone else read the contract to her, but she definitely was aware of its terms. It is also interesting that Jamie aggressively negotiated a contract with Schiavo for a contingent fee of 15 percent and a contract with Rapoport that included attorney liens within the 15 percent and also placed a cap on the total fees. She apparently was a shrewd contract negotiator.

Not long after Duhon sent to Jamie the memo Ike Huval prepared on the requirements for marriage in Louisiana, Jamie claimed in a December 8, 2006 email to Duhon that she had a "marriage paper." She repeatedly refused to let Duhon see it, however. Why would Duhon write a contemporaneous memo to the file on December 14, 2006 that Jamie said she knew a friend in government who could obtain a marriage certificate for her? Only two days after Duhon admonished her that her proposed course of action would be a criminal offense and the attorneys would have to withdraw, Jamie wrote a very long email complaining about the work of Dave Wise, telling Duhon that other attorneys had told her to drop Duhon from the case, and advising that the "contract will have to be revised, Carl." [Ex. B33, December 16, 2006, 11:53 a.m.]. Two days later when discussing things that need to be corrected in the lawsuit, Jamie says to Duhon "nobody that doubts my standing is going to handle that for me." [Ex. B33, December 18, 2006, 9:15 a.m.]. The coincidences are amazing.

Moreover, Jamie's stated reasons for terminating Duhon are without merit. Her termination letter said the contract "was signed under genuine duress." [Ex. B41, February 13, 2007 letter]. Even assuming that Jamie's statement is true, it does not address why she continued to ratify the contract for months thereafter and use Duhon's services. In *Baker v. Shapero*, 203 S.W.3d 697 (Ky. 2006), the client's sister sought out attorney Shapero, and the client Chiu signed the contingent Employment Agreement while in intensive care. *Id.* at 698. Chiu later discharged Shapero and attempted to avoid an attorney's lien by claiming "he was incapacitated at the time he signed the employment contract." *Id.* at 700. The court held:

> Although Chiu may not have had the legal capacity to contract on the day the employment agreement was executed, he clearly ratified his assent thereto by his subsequent actions.

*Id.* Chiu fired Shapero after three and one-half months. Jamie continued working with Duhon for more than five months. Her email on December 16, 2006 that the "contract will have to be revised,

Carl" belies her assertion that she was not aware of the contract or its terms. *Shapero* is controlling on this issue.

Jamie's statement that she thought her contract with Duhon was only "to open the succession in Louisiana in order to effectively retrieve bodily remains from the state of Kentucky" is refuted by her repeated emails with Duhon about the litigation. Duhon's original contract and the subsequent contract with Wise base their fees on a percentage of "the gross recovery ... of any monies received whether by settlement, trial or otherwise." [DE 3851-2]. What money was Duhon supposed to recover if he was not to assist with the crash litigation? Duhon's name was on the original Complaint filed against Comair. [Ex. B7, September 13, 2006 letters enclosing Complaint and contracts with attorneys]. Duhon attended the Status Conference on September 26 and the airport inspection on September 27 with Jamie's knowledge. [Ex. B8, September 20, 2006, 12:30 p.m.; September 21, 8:14 p.m.]. She asked Duhon to obtain photographs to be shown to the jury. In November 2006, Jamie was making arrangements to meet with Duhon and Wise in Lexington where all three would be attending this Court's November 20 Status Conference. [Ex. B27, November 1, 2006, 9:18 a.m.; Ex. B28, November 13, 2006, 11:05 a.m; Ex. B30, November 15, 2006, 2:43 p.m.]. On November 27, she emailed Duhon about an article mentioning a rift between two groups of plaintiffs' counsel regarding trial strategy. [Ex. B30, 10:36 p.m.]. These are but a few of the many, many times she discussed litigation strategy with Duhon.

The additional grounds/excuses her present counsel suggest for the firing of Duhon ring equally hollow in light of the entire record. The record provides very strong support for Duhon's argument that he was fired because he refused to participate in Jamie's plan to deceive the courts with her claim of a December 2004 marriage ceremony. It is the opinion of this Court that Mr. Duhon was not discharged for cause. Accordingly, the Duhon Firm may claim fees in *quantum meruit*.

2. Schiavo Withdrew With Cause

The reason for Motley Rice's withdrawal from representation of the Heberts is thoroughly documented. Motley Rice could find no evidence to support Jamie's marriage ceremony claim. To the contrary, the evidence refuted it. The children did not have Woodward's last name; his name was not on their birth certificates; there were no joint or separate tax returns indicating a marriage; there were no wedding photographs; there were no wedding rings; no photographs of them wearing wedding rings; no application for a marriage license or certificate; affidavits were filed by Jamie's family repeatedly stating there was no marriage ceremony; and a forensic document expert concluded that the signatures on the Affidavit of Matrimony and a Donation of Bryan Woodward's interest in certain real estate to Jamie were not likely signed by him. [DE 3917, June 2, 2008 letter]. Jamie even had trouble keeping up with her own story. She told Schiavo at first that the ceremony was performed by a female notary public. [DE 3917, p. 14]. After Schiavo advised that notary publics are not authorized to perform marriages in Louisiana, Jamie changed her mind and said the ceremony was performed by a male minister. *Id.* at 14-17.

Schiavo also admonished Jamie that the marriage claim was hindering the overall case and creating a conflict with Jamie's representation of her children. [DE 3917-1, May 8, 2008; June 2, 2008]. When Jamie refused to drop the marriage claim, Motley Rice had no choice but to withdraw. It is the opinion of this Court that Motley Rice's withdrawal was "with just cause." Accordingly, Motley Rice may claim fees in *quantum meruit*.

**B. Allocation of Attorney Fees**

1. The Dispute Among Counsel

There are several disputes among the three counsel teams regarding the allocation of available fees among them. Mr. Rapoport argues that fees in this case should be allocated based on the relative value of the services provided by each of the three litigation teams. He contends that his firm's efforts contributed "more than 90 percent of the valuable work," and the combined

efforts of the other firms contributed no more than 10 percent. [DE 3910, p. 18]. He caps the funds available for attorneys' fees at 15 percent under his contract. [DE 3910, p. 6]. He argues that the "fee enhancing" provision is not triggered because the value of the services rendered by the first two litigation teams does not "exceed 7.5% of the amounts recovered." [DE 3909, pp. 3-4]. The total recovery, including interest, is $7,152,638.31. [DE 3910, p. 6; DE 3921, p. 2]. Fifteen percent of the recovery is $1,072,895.75. Under Plaintiffs' analysis, the available funds would be allocated as follows:

| Rapoport | 90 percent | $965,606.18 |
|---|---|---|
| Motley Rice | 5 percent | 53,644.79 |
| Wilson, Polites, McQueen | 2.5 percent | 26,822.39 |
| The Duhon Law Firm | 2.5 percent | 26,822.39 |

Duhon argues, instead, that he is entitled in *quantum meruit* to the full amount of his fees, $127,942.00. [DE 3921, pp. 2-3]. Schiavo seeks either 15 percent of the $3.5 million opening settlement offer, $532,500.00; 15 percent of the $7.1 million recovery, $1,065.000.00; or $1,158,269.00 based on *quantum meruit*. [DE 3861, p. 7]. They both argue that these "claims," even at the low end, exceed 7.5 percent of the amount recovered and thereby trigger the fee enhancing provision under Rapoport's contract. [DE 3921, p. 2; DE 3917, p. 23].

Under the fee enhancement theory argued by Duhon and Schiavo, the maximum available funds for fees and expenses would be $1,788,157.58 ($7,152,638.31 x 25 percent). Total expenses incurred by all counsel of $417,866.49 have been reimbursed, and this amount would be deducted first to determine the amount available to satisfy the attorneys' fee claims. [DE 3910, p. 5; DE 3921, p. 3]. The remaining balance is $1,370,293.09. They argue that Rapoport's contract limits him to 7.5 percent of the recovery or $536,447.87, leaving a balance of $833,846.22. When Duhon's fees of $127,942.00 are subtracted, they claim a balance of $705,903.22 is available for Motley Rice and Wilson, Polites & McQueen. [DE 3921, p. 4]. Motley Rice, while

denying that the terms of the Rapoport contract are applicable to them, state they "will reduce their claims to $705,903.21 to fit within Rapoport's contract to finally bring an end to this sorry affair." [DE 3917, p.24]. In summary, Duhon and Motley Rice would increase the available fund to 25 percent of the total recovery, subtract expenses, and allocate the balance as follows:

| Rapoport | 7.5% | $536,477.87 |
| Motley Rice and Wilson, Polites & McQueen | 10.0% | 705,903.22 |
| The Duhon Law Firm | 1.8% | 127,942.00 |

Plaintiffs filed a surreply arguing that former counsel are misconstruing the contingent fee contract to significantly enhance their recovery and to limit fees to current counsel. [DE 3930]. They note that the fee provision begins: "For services rendered and to be rendered, I agree to pay as legal fees 15% of all amounts recovered." *Id.* at 2. The fee enhancing provision must be read in this context. The potential enhancement is for "attorney lien claims by predecessor counsel." An attorney's lien under Kentucky law is only "for a reasonable fee" when the prior contract does not apply. KRS 376.400. Rapoport argues:

> [T]he fee enhancing and limiting provision was added to grant a benefit to Rapoport Law Offices and not predecessor counsel. No provision in the contract allows fee enhancement for the sole purpose of benefitting predecessor counsel. It is obvious Jamie Hebert and David Rapoport never intended to abdicate to predecessor counsel the power to trigger a 25% obligation for the Heberts and a 7.5% limit for their attorneys by simply asking for more than 7.5% of the recovery and without regard to the legal validity of that claim.

[DE 3930 at 4].

Plaintiffs reiterate that attorney Schiavo requests an hourly rate of $650,[11] while Magistrate Judge Todd held that "an hourly rate of $225.00 is a reasonable rate in this legal community" for an experienced attorney in the Flight 5191 case given "the complexity of the litigation...." *Wombles*

---

[11] The Court notes that Schiavo also requests a rate of $650 per hour for local counsel McQueen and $450 per hour for three associates. [DE 3861, p. 6].

*Charters, Inc. v. Orix Credit Alliance, Inc.*, 2009 WL 580220, at *3 (E.D. Ky. March 4, 2009). Plaintiffs also argue that she claims "an outlandish number of hours given she never met her client during the representation and never attended a single deposition." [DE 3930 at 5].

Motley Rice responds that Rapoport's contract does not limit the quantum meruit recovery of predecessor counsel. [DE 3931, p. 2]. It also provides a detailed listing of work completed by date and notes this listing does not include an estimated 1500 hours devoted to other issues, such as the marriage, workers compensation and social security claims. [*Id.*; DE 3933]. It claims its attorneys attended depositions and worked with the PSC on several issues, including a three-day focus group mock jury trial of the case. [DE 3931, p. 3]. It also responds to Rapoport's questions regarding the experience and expertise of attorneys working on the case.

### 2. *Quantum meruit* Considerations

"*Quantum meruit*" in the context of a contingency fee agreement does not mean whatever amount a discharged attorney chooses to claim. Nor does it mean the number of hours allegedly spent by an attorney multiplied by a reasonable rate, without regard to whether the work contributed anything toward the fund from which attorneys are to be paid. The rate times hours calculation yields a "lodestar" amount that may be considered as a beginning point in determining reasonable fees, particularly in fee-shifting cases. It is not the only factor or the ending point, however.

*Quantum meruit* is defined to be: "as much as he or she has deserved." Black's Law Dictionary, West Pub. Co. (1996). In *Boone v. Coe*, 153 Ky. 233, 154 S.W. 900 (Ky. 1913), Kentucky's highest court said, in an action in *quantum meruit* to recover fees for personal services: "The doctrine of these cases proceeds upon the theory that the defendant has actually received some benefits from the acts of part performance; and the law therefore implies a promise to pay." *Id.* at 902. It continued:

> [I]t must appear that the defendant has actually received, or will receive, some benefit from the acts of part performance.  It is immaterial that the plaintiff may have suffered a loss because he is unable to enforce his contract.

*Id.*  The burden is on the party seeking *quantum meruit* to demonstrate the reasonable value of the part performance.  Krohn, *Causes of Action by Attorney to Recover Fees on a Quantum Meruit Basis*, 16 Causes of Action 85 (1988, 2010 update).

In *Baker v. Shapero*, 203 S.W.3d 697 (Ky. 2006), the court relied on its earlier decision in *Henry v. Vance,* 111 Ky. 72, 63 S.W.273 (1901), regarding a *quantum meruit* award.  *Baker*, 203 S.W.3d at 699.  In *Henry,* the court discussed some of the considerations for a fee award, such as "the extent of services rendered, and those to be rendered" and "such sum as is reasonably represented by the unperformed part of the labor." *Id.* at 276.

In *Krause v. Rhodes*, 640 F.2d 214 (6th Cir. 1981), the Sixth Circuit considered a case in which the fund for attorneys' fees was totally inadequate to compensate all counsel for their efforts.  The action arose out of the 1970 Kent State shooting cases.  The first trial counsel received an adverse verdict.  ACLU counsel was retained and succeeded on appeal with a remand for new trial.  ACLU counsel retried the case for four days and then negotiated a $600,000 settlement in which attorneys' fees were limited to $50,000.  The District Court awarded $33,740 in fees to the first trial counsel, saying that fixing the fees to modify any contingent fee contract was indispensable "to effect a settlement and to end this litigation which seemed as if it would never end."  *Id.*

First trial counsel appealed, claiming entitlement to his 33-1/3 percent contingency fee.  The Sixth Circuit said:

> A federal district judge has broad equity power to supervise the collection of attorneys' fees under contingent fee contracts.  As has often been stated,
>
> > where an attorney recovers a fund in a suit under a contract with a client providing that he shall be compensated only out of the fund he creates, the court having jurisdiction of the subject matter of the suit has power to fix the attorney's compensation and direct its payment out of the fund.

> Further "(t)he sum determined to be a reasonable attorney's fee is within the discretion of the district court...." Thus, an attorney's right to contract for a contingent fee is not completely beyond judicial control.

*Krause,* 640 F.2d at 218 (citations omitted). Despite the fact that "billing on a time and material basis might equal or exceed the 33-1/3 contingent fee for which he contracted," the court said that was "not the only aspect to be considered in assessing the reasonableness of an attorney's fee." *Id.* at 220. *See also Green v. Nevers*, 111 F.3d 1295 (6th Cir. 1997)(rejecting contingent fee claim where city offered settlement within three weeks of filing complaint).

In *Martin v. Buckman*, 883 P.2d 185 (Okla. Ct. App. 1994), the court was faced with allocation of fees between the discharged attorney, who substantially completed the litigation, and the replacement attorney who built on that work in achieving a settlement. The court considered the nature and services rendered by each lawyer. *Id.* at 195. It said:

> The proportionalization of each attorney's services, of course, is not to be evaluated on an hourly rate basis, but consideration should be given to the nature of the case, and **the relative contribution of each attorney to the creation of the contingent fee fund**.... The main objective is to evaluate the totality of the involved lawyers' efforts in terms of their proportional contribution to the creation of the fee fund to be divided.

*Id.*, emphasis added.

The Third Circuit had a Task Force of lawyers and judges from inside and outside the Circuit develop recommendations for fair and reasonable compensation for attorneys, and related issues, in light of ten years' experience using the lodestar method of calculation in all cases. Report of the Third Circuit Task Force, "Court Awarded Attorney Fees," 108 F.R.D. 237 (1985). The Task Force said "a distinction must be drawn between fund-in-court cases and statutory fee cases since the policies behind the two categories differ greatly." *Id.* at 250. "A key element of the fund case is that the fees are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading)...." *Id.*

> Another difference between fund-in-court and statutory fee cases is that in the former category there is a greater need for the judge to act as a fiduciary for the beneficiaries (who are paying the fee).... Judicial scrutiny is necessary inasmuch

as the fee will be paid out of the fund established by the litigation, in which the defendant no longer has any interest, and the plaintiff's attorney's financial interests conflict with those of the fund beneficiaries.

*Id.* at 251. For fund-in-court cases, the task force recommended that fees be based on a percentage of the recovery, rather than a lodestar analysis. It also recommended that the court exercise its discretion in making adjustments based on the circumstances, particularly in class-action cases. *Id.* at 255-256. *See also Dubin v. E.F. Hutton Group, Inc.*, 878 F. Supp. 616, 621 (S.D. NY. 1995) (upholding a percentage of recovery method for attorneys' fees in a common fund case).

While Kentucky and the Sixth Circuit have not published a case closely on point, the Court finds the analysis of these other jurisdictions persuasive and consistent with Kentucky law regarding the reasonableness of attorneys' fees. Rule 1.5(a) of the Kentucky Rules of Professional Conduct (Supreme Court Rule 3.130) lists eight "factors to be considered in determining the reasonableness of a fee":

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitation imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

SCR 3.130(1.5). These factors are more appropriate in a fee-shifting, lodestar case, but they have some relevance here.

### 3.   Available Funds

Before considering the above factors to determine the allocation of fees among counsel, it is necessary to determine the base amount available.  First, the Court finds, as discussed more fully below, that the value of the contributions of former counsel toward the creation of the fee fund does not exceed 7.5 percent of the total recovery.  Accordingly, the fee enhancing provision of the Rapoport contract is not triggered.  Despite agreeing to operate under the Rapoport contract at one point, Motley Rice later argued that it is not bound by the Rapoport contract.  While technically correct on that point, Motley Rice also agreed upon a 15 percent contingency contract and that any fees owed to discharged attorneys "will be deducted from the attorney fees, if any owed to MOTLEY RICE LLC at the conclusion of my case." [DE 3861-2].  It is the opinion of the Court under these circumstances that a fair and equitable fund for payment of all attorneys fees is 15 percent of the recovery.

The total recovery, including interest, is $7,152,638.31. [DE 3910, p. 6; DE 3921, p. 2].  Fifteen percent of the recovery is $1,072,895.75.  However, the first $56,150.73 in legal fees has already been paid by current counsel. [DE 3910 at 7].  Mr. Rapoport should be reimbursed for that amount, leaving a balance of $1,016,745.02 to be allocated among present and former counsel.

### 4.   Allocation of Fees

#### a.   *Duhon Law Firm*

Mr. Duhon's initial work was under extreme time constraints.  Jamie needed to recover Woodward's body before it was cremated.  Duhon was successful in that effort.  While this work was very important to Jamie, was beneficial to her, and was very time consuming, it contributed nothing to the fund out of which Duhon now seeks payment.  Duhon's agreement was to be compensated only out of the fund he was to create.  In this case, the "sum ... reasonably represented by the unperformed part of the labor" is a huge one. *Henry v. Vance*, 111 Ky. 72, 63 S.W. 273, 276 (1901).

Jamie insisted early on that two additional autopsies on Woodward be performed out of state. Rather than discourage this activity, Duhon accompanied the body to Louisville to secure its safekeeping; located a medical examiner in Joliet, Illinois and made necessary arrangements; drove to Chicago for the autopsy and a meeting with Jamie and David Wise; arranged yet another autopsy; and drove to Evanston, Illinois to meet with another medical examiner. [DE3877, Statement of Services, pp. 306]. The critical evidence at trial regarding Woodward's pain and suffering was the testimony of Dr. Tracy Corey, Kentucky's Chief Medical Examiner, who supervised the initial autopsy in Kentucky. All of the other autopsy activity contributed nothing to the trial outcome.

Duhon wisely joined with experienced aviation counsel to take the litigation lead in this complex matter. Duhon's role quickly evolved into that of a communication center to keep Jamie informed regarding progress in the litigation and to respond to her various demands. Duhon also handled personal financial matters for the family. These were time-consuming jobs, but they contributed virtually nothing to the fund. When one considers the time involved, the requisite skill required, and the experience, reputation and ability of the counsel, these factors weigh much more heavily in favor of Motley Rice and Rapoport.

It is the opinion of this Court that, for his services, Mr. Duhon should be compensated in the amount of $56,245.00 (Fifty-six Thousand, Two Hundred Forty-five Dollars).

b.    *Motley Rice and Wilson, Polites & McQueen*

Motley Rice's agreement with Jamie Hebert was executed on July 16, 2007, nearly a year after the litigation began. Mary Schiavo entered her appearance in this Court on September 11, 2007. [DE 642]. In support of its fee claim, Motley Rice states it filed Federal Tort Claims Act notices, drafted and filed two complaints and one amended complaint, handled several sets of interrogatories and requests for production and "took the case through all pretrial discovery." Their work records reflect that one of the complaints drafted was an FAA Bivens action, which they later

voluntarily dismissed. [DE 3861-3, p. 94]. Discovery responses on damages were filed. A response to Comair's motion to dismiss was filed November 13, 2007; however, it was barely more than one page long and incorporated the responses of other plaintiffs. [DE 1058]. A response to the United States' motion to dismiss was merely a paragraph incorporating the response to Comair. [DE 2298]. A response to Delta Air Lines' motion for summary judgment parrots the responses filed by other passengers. [Compare DE 2324, DE 2314, DE 2316, DE 2325]. Plaintiffs' motion in limine simply incorporated the motions of the Plaintiffs' Steering Committee. [DE 2625]. Motley Rice's pretrial memorandum was a bare bones account in two pages. [DE 2631]. Certainly, not all work was reflected in the docket of this case, but the Court has no reason to believe that other work deviated from this pattern.

Motley Rice does not dispute Jamie's claims that Schiavo never met with her in person at any time during the eleven months of representation and only spoke with her by telephone once for forty-five minutes. [DE 3887, p. 4]. Nor does it dispute that the primary contact between the firm and Jamie was Dotty Snelly, a paralegal. The record shows that when Motley Rice attempted to set up a meeting and scheduled expert examinations, it was thwarted by Jamie's refusal to communicate and refusal to have Lauren and Mattie-Kay examined by these experts. Motley Rice does not dispute that associates attended depositions of witnesses and never asked any questions of the witnesses. *Id.* at 5. It notes, however, that one of those associates was "a former airline captain of a major US carrier." [DE 3931, p. 3].

Motley Rice did not list the children of Bryan Woodward as witnesses for trial, nor were any experts listed as witnesses on their behalf. [DE 2633, DE 2708]. Jamie apparently thwarted that as well, according to Schiavo's June 10, 2008 letter to Jamie which states: "You advised the girls should not be witnesses and thus are not on the list." [DE 3933-2]. Rapoport, on the other hand, persuaded them that their testimony and the testimony of experts was very important to their case.

More than 70 percent of the ultimate trial verdict ($5 million of the $7.1 million) resulted from the children's  testimony and the testimony of experts on their behalf.

Additionally, Schiavo provided information to economist Dr. Baldwin that resulted in a projection of Woodward's earnings at $50,000 per year.  Rapoport interviewed Woodward's boss, Jeff Talley, obtained his affidavit and his video deposition that Woodward would have been promoted to a management position in 2009 with an increase in pay to $80,000, and introduced a supplemental report at trial with earnings projections at $80,000. [Transcript, December 2, 2009, pp. 154-180].

Motley Rice says its fees of $650 per hour for members and $450 per hour for associates have been approved by other U.S. District Courts, but those courts are not identified. [DE 3861, p. 6].  More importantly, the relevant consideration is "the fee customarily charged in the locality for similar legal services."  Judge Todd's approval of a rate of $225 per hour for one of the plaintiffs' attorneys is closer to the mark in this locality.

Motley Rice states it "undertook a tremendous amount of legal work and investigation to ascertain the factual basis for plaintiff's claim of marriage." [DE 3861, p. 4].  No doubt that is true, as did the other attorneys, but that work did not contribute to the creation of the fund from which Motley Rice seeks fees.

It is the opinion of this Court that Motley Rice should be compensated for their services in the amount of $245,500.00 (Two Hundred Forty-five Thousand Five Hundred Dollars).

c.    *Rapoport Law Offices*

Throughout the three years that Mr. Rapoport represented Jamie Hebert, this Court observed his thorough preparation, his strong advocacy, and his noteworthy trial skills.  Based on this Court's observations, Rapoport was overwhelmingly responsible for the $7.1 million Plaintiffs' verdict.  The $5 million loss of consortium verdict for the teenage children was record setting.

Motley Rice claimed it spent many hours preparing for the trial on liability, despite the fact that the Plaintiffs' Steering Committee played a substantial role in trial preparation. Rapoport, on the other hand, successfully moved for partial summary judgment on the issue of liability. [DE 3475, DE 3706].

Rapoport's October 8, 2008 status report said "[l]ittle discovery has been exchanged on the damages issues in this case." [DE 3326]. His firm conducted most of the discovery on the damages issues, including retention of Dr. Osofsky, her psychological evaluations of Lauren and Mattie-Kay, Jamie Hebert's deposition, video depositions of Dr. Corey and Jeff Talley, and a revised earnings report from Dr. Baldwin. He persuaded Lauren and Mattie-Kay to testify at trial along with their mother and grandfather. Motley Rice never met with any of these witnesses.

Motley Rice and Rapoport disagree about their relative "experience, reputation and ability." [DE 3930, DE 3933]. Based on the written record, both counsel appear well qualified. The Court had the opportunity to observe Mr. Rapoport personally on a number of occasions, including the damages trial. His skills in selecting and presenting the evidence and his handling of the unique, all-male jury were among the best this Court has seen in over twenty years on the bench.

The key components of the verdict must be credited to him. The loss of consortium verdicts totaling $5 million for Lauren and Mattie-Kay were a direct result of his persuading them to be examined by Dr. Osofsky and to testify at trial. The pain and suffering verdict of $750,000 must be attributed to the testimony of Dr. Corey, Professor Kennedy and Dr. Burton. According to Mr. Rapoport, "neither predecessor plaintiff team worked with them or even attended their depositions." [DE 3910, p. 17]. Finally, Rapoport's work with Jeff Talley and the amended Baldwin report which increased Woodward's lost earnings projection by 60 percent ($80,000 - $50,000 = $30,000 divided by $50,000 = 60 percent) had to have been an important factor in the lost earnings portion of the verdict. Rapoport's demonstrated trial talent was sufficient to cause Comair to make a

settlement offer of $8.1 million after the compensatory damages verdict, despite strong legal

arguments against punitive damages and in favor of reduction of the damages award on appeal.

It is the opinion of this Court that, for his services, the Rapoport Law Offices should be

compensated in the amount of $715,000.00 (Seven Hundred Fifteen Thousand Dollars).

## IV.    CONCLUSION

**IT IS ORDERED** that:

1.    The Rapoport Law Offices are to be reimbursed for payments in the amount of $56,150.73.

2.    The Rapoport Law Offices are entitled to payment for attorney fees in the amount of $715,000.00.

3.    Motley Rice LLC and its local counsel, Wilson, Polites & McQueen, are entitled to payment for attorney fees in the amount of $245,500.00.

4.    The Duhon Firm is entitled to payment for attorney fees in the amount of $56,245.00.

5.    If no objection to this Order is filed within ten days of its entry, the Court will issue a separate order directing the Clerk to issue checks to distribute the funds deposited in the Court Registry Investment System.

This June 9, 2011.

**Signed By:**

*__Karl S. Forester__*   K S F

**United States Senior Judge**